## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| LEWIS COUCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:12 CV 66 DDN |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Lewis Couch for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., and supplemental security income under Title XVI of that Act, 42 U.S.C. § 1381, et seq.  For the reasons set forth below, the decision of the Administrative Law Judge is reversed and remanded.

### I.  BACKGROUND

Plaintiff Lewis Couch, born September 8, 1969, filed applications for Title II benefits and Title XVI benefits on December 18, 2009.  (Tr. 143-49.)  He alleged an onset date of disability of September 18, 2009, due to depression, social anxiety, sleep apnea, high blood pressure, chronic back and foot pain, and obesity.  (Tr. 143, 186-87.) Plaintiff's applications were denied initially on March 25, 2010, and he requested a hearing before an ALJ.  (Tr. 88-96.)

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.  The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity.  Fed. R. Civ. P. 25(d).

On March 14, 2011, following a hearing, the ALJ found plaintiff not disabled.  (Tr. 11-24.)  On June 28, 2012, the Appeals Council denied plaintiff's request for review.  (Tr. 1-4.)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

On August 23, 2007, Jeffrey Harden, D.O., performed a mental status examination on plaintiff.  Plaintiff complained that he felt dissatisfied with his life and stated that depression and suicidal thoughts led to his recent nine-day hospitalization.  His mother raised him, and he does not know his father.  He stopped attending school during the eleventh grade due to difficulty reading, but he later received his GED.  He had been married for two years and has six children.  From ages twelve to thirty-three, he abused alcohol nearly every day.  He had been arrested about twenty times for various offenses including failure to pay domestic obligations.  He reported that he had held about thirty jobs and that his longest employment term lasted for two years.  He had not worked during the past six months.   His family medical history includes depression, schizophrenia, dementia, and alcoholism.  Plaintiff's medications included Lexapro, Nortriptyline, Clonidine, Toprol, and hydrochlorothiazide.[2]  Plaintiff received treatment in 1997 for overdosing on pills and alcohol and in 1989 for attempting suicide by motorcycle collision.  (Tr. 362.)

Plaintiff complained of hearing voices, suicidal and violent thoughts, his inability to find employment, his lack of driver's license, his eating habits and obesity, and the likelihood that he would go to prison soon for failure to pay domestic obligations.  He also experienced difficulties with sleep and focus and suffered panic symptoms around others.

---

[2]  Lexapro is an antidepressant used to treat depression and anxiety.   WebMD, http://www.webmd.com/drugs (last visited August 14, 2013).   Nortriptyline is used to treat mental or mood problems such as depression and migraine headaches.  Id.  Clonidine is used to treat high blood pressure.  Id.  Toprol is a beta-blocker used to treat chest pain, heart failure, and high blood pressure.  Id.  Hydrochlorothiazide is used to treat high blood pressure.  Id.

Dr. Harden diagnosed plaintiff with major depressive disorder, social anxiety disorder, and posttraumatic disorder and gave a GAF score of 35.[3]  He strongly advised supervision of plaintiff's psychiatric medications and therapy.  (Tr. 363.)

On September 26, 2007, plaintiff received treatment for depression.  Plaintiff reported that he found employment and also qualified for Medicaid.  As a result, plaintiff's mood improved, and Brenda Sidwell, MSW, LCSW, found his need for counseling reduced.  (Tr. 291.)

On August 11, 2008, plaintiff complained of sexual performance issues, tingling in both hands, right ear deafness, and fatigue.  Jason Butler, APRN, diagnosed erectile dysfunction, otitis externa, fatigue, and ganglion cysts.[4]  He prescribed Ciprodex and Viagra and a recommended a sleep study.[5]  (Tr. 375.)

---

[3] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function.  A GAF score has two components.  The first component covers symptom severity and the second component covers functioning.  A patient's GAF score represents the worse of the two components.

A score from 31 to 40 indicates impairment in reality testing or communication (such as speech that is at times illogical, obscure, or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work).  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed. 2000) ("DSM-IV-TR").

[4] Otitis externa is the inflammation of the external auditory canal.  Stedman's Medical Dictionary, 1394 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman").  Ganglion cysts contain mucopolysaccharide-rich fluid within fibrous tissue or occasionally, muscle bone or semilunar cartilage.  Id. at 785.

[5] Ciprodex is used to treat bacterial ear infections.  WebMD, http://www.webmd.com/drugs (last visited August 14, 2013).

On December 3, 2008, nurse practitioner Butler performed a polysomnogram on plaintiff.[6]  He observed obstructive sleep apnea and recommended a continuous positive airway pressure (C-PAP) titration study for further treatment.[7]  (Tr. 427-28.)

On December 9, 2008, plaintiff underwent a C-PAP titration study.  Nurse practitioner Butler observed improved sleep continuity and oxygen saturation as a result of the study and recommended continued use of a C-PAP machine.  (Tr. 379-80.)

On January 16, 2009, plaintiff underwent an initial examination at the Western Reception Diagnostic and Correctional Center.  His medications included Flonase, Ranitidine, Metoprolol, Clonidine, K-Dur, Lisinopril, and hydrochlorothiazide.[8]  (Tr. 294-300.)

On January 20, 2009, plaintiff complained of acute back pain.  A nurse noted that the pain caused discomfort and impaired mobility and provided him with acetaminophen. (Tr. 303-04.)

On January 27, 2009, plaintiff notified a nurse that he required a C-PAP machine and complained of back pain.  The nurse sent for the result of the sleep study and referred plaintiff to a physician for his back pain.  (Tr. 308-09.)

On February 2, 2009, Dr. Frederick Covillo assessed hypertension and prescribed Naproxen.[9]  (Tr. 307-08.)

---

[6] Polysomnograms are used in sleep studies to measure multiple physiologic variables associated with sleep.  Stedman at 1540.

[7] C-PAP machines help those with obstructive sleep apnea to breathe more easily during sleep.   WebMD,   http://www.webmd.com/sleep-disorders/sleep-apnea/continuous-positive-airway-pressure-cpap-for-obstructive-sleep-apnea (last visited August 14, 2013).

[8] Flonase is used to relieve nasal symptoms such as runny or stuffy noses, itching, and sneezing.  WebMD, http://www.webmd.com/drugs (last visited August 14, 2013). Ranitidine is used to treat heartburn.  Id.  Metoprolol is used to treat chest pain, heart failure, and high blood pressure.  Id.  K-Dur is a mineral supplement used to treat or prevent low levels of potassium.  Id.  Lisinopril is used to treat high blood pressure.  Id.

[9]Naproxen is used to relieve pain.  WebMD, http://www.webmd.com/drugs (last visited August 14, 2013).

- 4 -

On March 2, 2009, plaintiff fell while climbing into his bed, which was a top bunk bed.  He suffered a laceration above his eyebrow.  He received treatment at the Heartland Regional Medical Center emergency room.  His wound was cleaned, and he complained of left knee and lower back pain.  (Tr. 317-18.)

On March 5, 2009, plaintiff complained of difficulty standing.  He requested a bottom bunk bed, knee and back X-rays, and permission to stay in his bed.  A nurse provided him with aspirin, hydrocortisone, and tolnaftate.[10]  (Tr. 320-21.)

On March 6, 2009, plaintiff complained of left knee and back pain.  Dr. Alice Graham assessed left leg and knee trauma, low back muscle spasms, and rhinitis.  She prescribed analgesic balm and Loratadine and encouraged weight loss.[11]  She also permitted him two days rest and granted his request for a bottom bunk bed.  (Tr. 322-23.)

On May 11 and July 20, 2009, Dr. Graham assessed plaintiff with chronic back pain.  (Tr. 329, 341.)  On August 20, 2009, Dr. Graham assessed hypertension.  (Tr. 348.)

On November 16, 2009, Dr. Harden performed a psychiatric evaluation on plaintiff.  Plaintiff complained of severe depression and relationship problems with his mother and reported his release from prison two months ago.  He stated that most days, he experiences difficulty leaving his bed.  He noted his family history of obesity and hypertension.  His medications included Wellbutrin and Nortriptyline.[12]  He described his mother as a workaholic and complained that his mother and maternal grandfather verbally and emotionally abused him.  His arrests usually involved drinking and failure to pay domestic obligations.  He currently performs yard work.  His inability to regularly and promptly

---

[10]  Hydrocortisone is used to treat a variety of skin conditions.  WebMD, http://www.webmd.com/drugs (last visited August 14, 2013).  Tolnaftate is an antifungal used to treat skin infections.  Id.

[11]  Loratadine is an antihistamine used to treat itching, runny nose, watery eyes, and sneezing.  WebMD, http://www.webmd.com/drugs (last visited August 14, 2013).

[12]  Wellbutrin is an antidepressant used to treat depression and other mental or mood disorders.  WebMD, http://www.webmd.com/drugs (last visited August 14, 2013).

attend work cause his inability to maintain employment.  His interests include horses and his children.  (Tr. 359-60.)

Plaintiff described his mood as irritable and frustrated and appeared anxious.  He complained of poor focus, energy, and motivation, nightmares, flashbacks, panic attacks, and obsessive-compulsive tendencies.   Dr. Harden diagnosed posttraumatic stress disorder, agitated major depressive disorder, generalized anxiety disorder with panic, and alcoholic dependency in remission and gave a GAF score of 43.[13]  He recommended that plaintiff receive psychotropic medication management and that he learn skills to cope with his depression and to improve his self-esteem.  (Tr. 360-61.)

On December 15, 2009, plaintiff complained of depressed mood and gastroesophageal reflux disease and requested a refill of his medications.  He received diagnoses of depression, gastroesophageal reflux disease and hypertension.  (Tr. 371.)

On December 21, 2009, plaintiff complained of irritability and depression and reported that he slept to avoid directing anger at others.  He further reported nightmares, flashbacks, poor motivation, concentration, and energy, panic attacks, and back pain.  He also noted that Prozac did not help him.[14]  Cynthia Mayberry, APRN, diagnosed bipolar disorder, general anxiety disorder with panic attacks, posttraumatic stress disorder, and alcohol dependency in remission.   She prescribed Geodon and further psychiatric treatment.[15]  (Tr. 358.)

---

[13] A GAF score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job).  DSM-IV-TR at 32–34.

[14] Prozac is used to treat depression, panic attacks, and other mental disorders.  WebMD, http://www.webmd.com/drugs (last visited August 14, 2013).

[15] Geodon is used to treat certain mental or mood disorders.   WebMD, http://www.webmd.com/drugs (last visited August 14, 2013).

- 6 -

On January 4, 2010, plaintiff reported that he discontinued Prozac and complained of increased drowsiness.  (Tr. 370.)

On January 5, 2010, plaintiff reported his attempts to acquire a commercial driver's license, which alleviated his stress about his finances.  Brenda Sidwell assessed depression and bipolar disorder.  (Tr. 369.)

On January 13, 2010, plaintiff complained of difficulty with his Geodon dosage. He reported improved mood, motivation, and concentration.  Nurse practitioner Mayberry adjusted his Geodon dosage and prescribed Celexa.[16]  (Tr. 413.)

On January 20, 2010, plaintiff discussed his relationships and his difficulty setting boundaries.  He reported improved sleep, motivation, concentration, and energy and fewer nightmares, flashbacks, worries, and panic attacks.  (Tr. 412.)

On January 21, 2010, plaintiff inquired about a C-PAP machine and complained of continued sleep apnea symptoms.  (Tr. 368.)

On January 28, 2010, Sarah Hallum performed a case analysis on behalf of Missouri Disability Determination Services.  After examination of his medical records, she found his alleged conditions of sleep apnea, high blood pressure, chronic back and foot pain, and obesity not severe.  (Tr. 399.)

On February 3, 2010, plaintiff complained of frustration and irritability caused by his recent interaction with his father at a family gathering.  Plaintiff reported calmer mood, normal sleeping habits, improved motivation, concentration, and energy, merely occasional nightmares and flashbacks, no panic attacks, and no suicidal or violent thoughts.  Nurse practitioner Mayberry prescribed Minipress.[17]  (Tr. 410.)

On February 26, 2010, plaintiff complained of increased depression.  He also complained that Celexa did not help him.  Nurse practitioner Mayberry discontinued

---

[16] Celexa is used to treat depression.  WebMD, http://www.webmd.com/drugs (last visited August 14, 2013).

[17] Minipress, also known as Prazosin, is used to treat high blood pressure.  WebMD, http://www.webmd.com/drugs (last visited August 14, 2013).

Celexa and prescribed Cymbalta.[18]  On March 4, 2010, plaintiff complained of increased depression due to the weather and his family.  (Tr. 408-09.)

On March 8, 2010, plaintiff reported that his use of the C-PAP machine improved his fatigue.  His wife informed him that she no longer noticed any symptoms of sleep apnea.  (Tr. 432.)

On March 10, 2010, plaintiff reported that he experienced happiness during the entire past week.  He also expressed concern about his weight.  Nurse practitioner Mayberry discontinued Cymbalta and prescribed Lexapro.  (Tr. 407.)

On March 25, 2010, Michael Stacy, Ph.D., submitted a Mental Residual Functional Capacity Assessment form regarding plaintiff.  Dr. Stacy found that plaintiff could understand, remember, and perform simple to moderately complex instructions, make similarly complex work-related decisions, and sustain concentration and pace.  He further found that plaintiff could relate appropriately to others in the workplace and adapt to changes in work routine.  (Tr. 384-86.)

On March 25, 2010, Dr. Stacy also submitted a Psychiatric Review Technique form.  Dr. Stacy found that plaintiff suffered from agitated major depressive disorder, posttraumatic stress disorder, generalized anxiety disorder with panic, and alcohol dependence in remission.  He further found plaintiff's allegations regarding his mental conditions partially credible, noting the unremarkable nature of plaintiff's recent mental status examinations and discrepancies between the reports from plaintiff and third parties. He concluded that considering the improvement in plaintiff's mental condition, his mental condition presented only mild to moderate functional limitations.  (Tr. 387-97.)

On April 8, 2010, plaintiff reported increased ability to leave his bed, to enjoy his children, and to prevent negative thoughts.  Nurse practitioner Mayberry increased his Remeron dosage.[19] On April 15, 2010, plaintiff reported an enjoyable visit from his father

---

[18]  Cymbalta is used to treat depression and anxiety.  WebMD, http://www.webmd.com/drugs (last visited August 14, 2013).

[19]  Remeron is used to treat depression.  WebMD, http://www.webmd.com/drugs (last visited August 14, 2013).

and brother and that he began fishing.  He complained about his parole officer but stated that it did not affect his mood.  (Tr. 403-04.)

On May 11, 2010, plaintiff reported that his mother began living with him, which he felt went well.  He also reported his reluctance regarding the possibility of stomach surgery.  (Tr. 402.)

On May 18, 2010, plaintiff went to the emergency room, complained of bipolar disorder and depression, and voluntarily admitted himself.  He reported nightmares, suicidal and homicidal thoughts, and that his compulsive eating habits caused him to gain one hundred pounds during the past year.  Plaintiff received a lumbar spinal X-ray, which revealed degenerative disc disease.  On May 19, 2010, Salvador Sanchez-Zuniga, M.D, diagnosed severe, recurrent major depressive disorder without psychotic features and gave a GAF score of 35.  Dr. Sanchez-Zuniga prescribed Lexapro.  On May 25, 2010, Dr. Sanchez-Zuniga gave a GAF score of 50 and discharged plaintiff.  (Tr. 471-86.)

On July 12, 2010, plaintiff complained of intermittent leg numbness.  Joseph Novinger, D.O., assessed edema, depression, hyperlidemia, and impaired fasting glucose. (Tr. 504-05.)

On July 23, 2010, plaintiff complained of anxiety, fear, thoughts of death and suicide, and difficulty sleeping.  Dr. Novinger diagnosed anxiety and depression, prescribed Buspar, and increased plaintiff's Zoloft dosage.[20]  (Tr. 509-10.)

On September 1, 2010, plaintiff complained of deep burning pain in his back and shoulders, depression, shortness of breath, and increasingly frequent nightmares.  Dr. Novinger increased plaintiff's Buspar and Prazosin dosages and prescribed Naproxen.  He observed the continued presence of edema.  (Tr. 511-13.)

---

[20] Buspar is used to treat anxiety.  WebMD, http://www.webmd.com/drugs (last visited August 14, 2013).  Zoloft is used to treat depression and other mental or mood disorders. Id.

On September 14, 2010, plaintiff went to the emergency room and complained of intermittent heavy chest pain that began earlier that day while working in his yard. Shortness of breath, perspiration, and dizziness accompanied the chest pain, which he rated as 9 of 10.  He suffered a less severe episode of chest pain the previous day.  During his admission, he received an electrocardiogram, which revealed sinus tachycardia, and a chest X-ray, which revealed atelectasis in the right lung base.[21] John Rickleman, Jr., D.O., diagnosed hypovolemic hypertension, coronary vasospasm, acute renal insufficiency, and probable underlying chronic kidney disease.[22]   On September 16, 2010, plaintiff was discharged.  (Tr. 495-501.)

On September 22, 2010, plaintiff met with Dr. Novinger to follow up on renal insufficiency and chest pain.  Dr. Novinger noted the absence of edema and diagnosed chest pain and hypertension.  (Tr. 515.)

On September 28, 2010, nurse practitioner Mayberry submitted a Medical Source Statement of Ability To Do Work-Related Activities (Mental) regarding plaintiff.  She found that plaintiff's mental conditions markedly restricted his ability to understand, remember, and perform complex instructions and his ability to make complex work-related decisions.  She further found extreme restrictions regarding his ability to respond appropriately to usual work situations and to changes in a routine work setting due to major depressive disorder and bipolar disorder.  She noted that his anxiety did not cause anger but forced him to leave social situations.  She also noted his panic attacks and his extreme difficulty with focus and concentration.  (Tr. 488-90.)

On October 7, 2010, plaintiff received a lumbar spinal X-ray.  Catherine Barteau, D.O., found mild degenerative disc disease at L5-S1.  (Tr. 493.)

---

[21] Sinus tachycardia is rapid beating of the heart originating in the sinus node.  Stedman at 1291.  Atelectasis is the decrease or loss of air in all or part of the lung resulting in the loss of lung volume.  Id. at 173.

[22] Hypovolemia is a decreased amount of blood in the body.  Stedman at 939. Vasospasms are contractions or hypertonia of the muscular coats of the blood vessels.  Id. at 2093.

On October 20, 2010, plaintiff met with Dr. Novinger to follow up on chest pain. Dr. Novinger noted the absence of edema and diagnosed prinzmetal angina, anxiety, and hypertension.[23]  (Tr. 518-19.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on September 30, 2010.  (Tr. 31-71.) Plaintiff testified to the following.  He lives with his wife and three children.  Plaintiff measures five feet, eight inches and 375 pounds.  He last drank alcohol six years ago and uses only prescribed drugs.  (Tr. 34-36, 59.)

He received his GED and later obtained a commercial driver's license.  He first attempted to obtain a commercial driver's license in November 2009.  However, because he failed the driving test twice, he received the license in 2010 after retaking the driving course.  He previously worked as a certified nursing assistant, medical aide, maintenance worker, and factory laborer.  He has not worked since his alleged onset date of September 18, 2008.  (Tr. 34-35, 62.)

He first received psychological treatment at age eighteen after a suicide attempt. During his hospitalization and for some time thereafter, he received medication.  In 1998, he was again hospitalized after a suicide attempt but did not receive further treatment following a seventy-two hour hold.  In 2007, he was hospitalized for nine days for severe depression and anxiety.  Afterwards, he received regular mental treatment.  In 2010, he was hospitalized again.  (Tr. 36-39.)

When depressed, he feels sad, worthless, hopeless, nauseated, and anxious.  His chest flutters, and he loses control.  He also experiences panic attacks, which causes discomfort, agitation, racing thoughts, and loss of focus.  Depression and panic attacks alternate, but his depressed state occupies about eighty percent of his time.  (Tr. 39-40.)

---

[23] Prinzmetal angina is chest pain not precipitated by cardiac work, is of longer duration, and is associated with electrocardiographic manifestations.  Stedman at 85.

During his depressed state, he typically falls asleep at 7:00 or 8:00 p.m. and leaves his bed at 12:00 or 1:00 p.m. the following day.  When awake, he eats, sits, thinks about changing his thought process, and feels worthless, hopeless, sad, and depressed.  After about an hour, he returns to bed.  After two or three hours, he eats again.  He then sits for fifteen or twenty minutes and wishes for sleep.  Next, he returns to bed, although he occasionally paces.  He interacts very little with his family but generally wishes that he could spend more time with them.  He never leaves the house or allows guests.  (Tr. 41-44, 46-47.)

He discusses his thoughts and habits with his counselor.  Depression has affected him since age twelve.  He has no preference regarding his food; his diet is a matter of convenience.  Sleep provides a coping mechanism, and he struggles to leave his bed.  When employed in 2008, he missed one or two days of work per week due to depression and the inability to leave his bed, which led to his eventual termination.  (Tr. 42-46.)

When not depressed, his thoughts race about half the time.  His racing thoughts frustrate him because he cannot focus.  When experiencing neither depression nor racing thoughts, he ventures out of his home, although he still experiences some anxiety.  He takes his children to the park, where they play on monkey bars, slides, and merry-go-rounds, and he sits and watches.  While sitting in the park, he wishes that he could take his children places more often.  (Tr. 47-48.)

His various states of mind generally alternate unpredictably, although certain events trigger his panic attacks, which occur two or three times a week.  For instance, his wife's encouragement to leave the house causes panic attacks.  He wishes that she would leave him alone and allow him to return to bed. He dreads interacting with others, even indirectly.  Groups of five or more people and heavy traffic also cause panic attacks.  During panic attacks, he paces and tries to feel comfortable.  He experiences agitation, anger, short temper, and moodiness.  Panic attacks last one or two hours.  His medications for anxiety include Metoprolol, Buspar, Geodon, and Norvasc.  He takes Buspar twice per day, which relaxes him but also causes grogginess.  One or two nights per week, he does

- 12 -

not sleep.  He lays in bed, tosses and turns, and his mind races.  His thoughts race for two to three days at a time, which he describes as manic episodes.  (Tr. 49-52, 58-59.)

He recently went to the hospital due to his heart, which spasms and causes chest pains, heaviness, and shortness of breath.  He received a diagnosis of angina and a prescription for nitroglycerine, which he takes once per week.  Nitroglycerine causes severe headaches.  He usually sleeps one hour after taking it, but upon awakening, he no longer experiences chest pain.  (Tr. 52-53.)

He suffers from dizziness for a few seconds after quickly changing body positions. He also experiences tightness and sharp burning pain underneath his shoulder blades if he sits for fifteen or twenty minutes.  He takes Robaxin every four hours and another medication twice per day, which alleviates his pain and allows him to sit for two or three hours.  (Tr. 53-55.)

He suffers from edema in his legs.  Fluid builds in his legs, which causes swelling and cramps.  He elevates his legs four or five times per day.  He also takes medication for edema, which causes trips to the restroom four or five times per hour for two or three hours.  He last consulted a physician, Dr. Novinger, regarding his back, legs, and heart on September 1, 2010.  He has received instructions to walk.  He can walk two or three blocks.  A year ago, he could walk one mile.  (Tr. 55-56, 62-63.)

At home, he cleans dishes and performs yard work.  Cleaning dishes takes him ten to fifteen minutes.  His wife and children clean dishes when he cannot due to back and leg pain.  Fifteen to twenty minutes of yard work triggers his heart condition, which includes spasms, chest pain, and shortness of breath.  Performing household work causes him to feel worthy because it helps his family.  He can stand for twenty to thirty minutes before experiencing back and leg pain.  He can prepare sandwiches and chips but does not cook. He operates motor vehicles once or twice per week when he takes his children to church. He shops once per month.  He recently acquired a pet dog, but his children care for it.  He trained horses until two or three years ago.  He can balance bank accounts, track bills as

they become due, keep appointments, and count change.  He reads the Bible daily in half-hour intervals.  He does not use or own computers or cellphones.  (Tr. 56-58, 60-62.)

Vocational expert (VE) Denise Waddell also testified at the hearing.  The VE testified that plaintiff worked as a certified medical technician, which is medium, semi-skilled work; certified nursing assistant, which is medium, semi-skilled work; maintenance worker, which is medium, unskilled work; and meat processing line worker, which is medium, unskilled work.  (Tr. 65.)

The ALJ presented a hypothetical question concerning an individual with plaintiff's education, training, and work experience.  The individual can perform sedentary work, except that such individual can understand, remember, and perform only simple and repetitive instructions, can tolerate only rare changes in work processes and environment, and cannot maintain strict production and performance quotas.  The VE responded that such individual could perform the sedentary, unskilled work of a production checker with 39,000 positions nationally and 700 statewide, lens inserter with 20,000 positions nationally and 500 statewide, and semi-conductor bonder with 115,000 positions nationally and 2,000 statewide.  The VE additionally testified that these jobs did not require contact with the general public or more than incidental contact with coworkers and supervisors.  (Tr. 65-66.)

The ALJ altered the hypothetical individual with the requirements that the individual could sit only for ten minutes at a time before needing to stand for three minutes, required temperatures between 65 and 80 degrees, should avoid exposure to humidity, wetness, smoke, fumes, dust, gases, and poor ventilation, and could only occasionally climb ramps and stairs, balance, and stoop, but never climb robes, ladders or scaffolds, kneel, crouch or crawl.  The VE responded that such individual could perform the aforementioned jobs.  (Tr. 66.)

In response to the questioning of plaintiff's counsel, the VE further testified that if the hypothetical individual had an extreme limitation with the ability to work in a normal setting or the ability to adapt to normal changes in the work setting, such individual could

perform no work.  If such individual chronically missed more than one day of work per month, arrived late more than three times, needed to leave the workstation in excess of scheduled breaks, or performed no work at the workstation for more than ten percent of the time, the aforementioned jobs would be eliminated.  Additionally, if the individual needed three to four bathroom breaks per hour before lunch break or complete isolation, the individual could perform no work.  Most manufacturing jobs require working around more than five people and with foot traffic, although the number of employees varies from employer to employer.  (Tr. 66-69.)

### III. DECISION OF THE ALJ

On March 14, 2011, the ALJ issued a decision that plaintiff was not disabled.  (Tr. 11-24.)  At Step One of the prescribed regulatory decision-making scheme,[24] the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, September 18, 2008.  At Step Two, the ALJ found that plaintiff's severe impairments were degenerative disc disease of the lumbar spine, sinus tachycardia, obstructive sleep apnea, obesity, major depressive disorder, posttraumatic stress disorder, generalized anxiety disorder with panic, and alcohol dependence in remission.  (Tr. 13.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments.  (Tr. 16.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform sedentary work, except that plaintiff can understand, remember, and perform only simple instructions, deal with only rare changes in work processes and environment, and cannot maintain strict production or performance quotas. At Step Four, the ALJ found plaintiff unable to perform any past relevant work.  (Tr. 18-22.)

---

[24] See below for explanation.

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy.  (Tr. 22.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).   If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.   Step Four requires the

- 16 -

Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW).  Id. § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating he is no longer able to return to his PRW.  Pate-Fires, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred by (1) affording the opinion of nurse practitioner Mayberry's opinion minimal weight regarding his mental ability to work, (2) failing to find that plaintiff satisfied the requirements of Listings 12.04 and 12.06; and (3) failing to properly consider plaintiff's credibility.

### A. Opinion of Nurse Practitioner Mayberry

Plaintiff first argues that the ALJ erred in affording minimal weight to the opinion of nurse practitioner Mayberry regarding his mental ability to work.  In his decision, the ALJ afforded minimal weight to nurse practitioner Mayberry's opinion, stating that nurse practitioners are not acceptable medical sources and that plaintiff's admitted activities and abilities contradict her opinion that plaintiff suffers extreme limitations with responding appropriately to situations and changes.  (Tr. 21.)

To support his argument, plaintiff relies on an agency ruling that clarifies the methodology for the consideration of opinions from medical sources not designated by Social Security regulations as "acceptable medical sources."  Titles II & XVI: Considering Opinions & Other Evidence from Sources Who Are Not "Acceptable Med. Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental & Nongovernmental Agencies, SSR 06-03P (2006).  According to the ruling, the "acceptable medical source" designation is meaningful for several reasons, including the establishment

- 17 -

of a medically determinable impairment and entitlement to controlling weight.  Id.  at *2.
However, the ruling also states that the ALJ must consider opinions from other medical
sources.  Id. at *4.  Further, the ruling states that although the status of "acceptable
medical source" may sufficiently justify the decision to afford greater weight to such
opinions, circumstances can arise where the decision to afford greater weight to other
medical sources is also justified.  Id. at *5.

The ALJ's decision reflects his consideration of nurse practitioner Mayberry's
opinion.   Additionally, the RFC determination is consistent with nurse practitioner
Mayberry's opinion, except for her opinion that plaintiff's limitations with responding
appropriately to situations and changes were extreme, which the ALJ found inconsistent
with plaintiff's admitted activities and abilities.  Specifically, the ALJ included in the RFC
determination that plaintiff can deal with only rare changes in work processes and
environment.

Whether an opinion is consistent with other evidence is a valid factor for
consideration.  SSR 06-03P at *4.  The ALJ specifically cited plaintiff's attendance at
school for his commercial driver's license.  Plaintiff argues that the ALJ failed to consider
and had little information the distance between the school and his home, plaintiff's
attendance, absences, and early departures, the number of attempts, and duration of his
efforts.  However, the ALJ mentioned the school and license merely as an example of
inconsistent activities within the records, and, even assuming the truth of plaintiff's
allegations, obtaining a license indicates some ability to respond appropriately.  Moreover,
he informed nurse practitioner Mayberry that his mother moved into his home and that he
thought it went well.  (Tr. 402.)  Further, his description of a fishing trip with his father as
"great" is particularly meaningful in light of his father's long absence from his life and his
initial irritability with his father months earlier.  (Tr. 362, 403, 410.)

Substantial evidence supports the ALJ's treatment of nurse practitioner Mayberry's
opinion.  Accordingly, plaintiff's argument is without merit.

**B. Listings 12.04 and 12.06**

Plaintiff next argues that the ALJ erred by failing to find that plaintiff met the requirements of Listings 12.04 and 12.06.  Listing 12.04 pertains to affective disorders, including depressive and manic syndromes, and Listing 12.06 pertains to anxiety related disorders.  20 C.F.R. § 404, App. 1.  Each Listing sets forth sets of criteria entitled A, B, and C, which a claimant must satisfy in various combinations to qualify.  Id.  Plaintiff specifically challenges the ALJ's determination regarding the B criteria, which are identical for both Listing 12.04 and Listing 12.06.

To satisfy the B set of criteria for Listing 12.04 and Listing 12.06, a claimant must show that he suffers at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

Id.  Plaintiff asserts that the ALJ erred by determining that plaintiff merely suffered mild restriction in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties regarding concentration, persistence, and pace, and no lengthy episodes of decompensation.  The regulations define the relevant terms as follows:

> Where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis.
>
> * * *
>
> 1. Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.
>
> * * *
>
> 2. Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.
>
> * * *

3. Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.

\* \* \*

4. Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.

Id.

Regarding his determination that plaintiff suffered from mild restriction with daily living activities, the ALJ relied on findings that plaintiff is capable of personal care, performing chores, shopping, driving, and leaving his home alone.  (Tr. 17.)  However, plaintiff argues that the ALJ failed to account for the nature of his depressive and manic states.  Plaintiff's testimony and several medical records support plaintiff's allegations that he suffers from depressive and manic episodes alternately and intermittently.  (Tr. 32-52, 58-59, 279-80, 402-04, 407-10, 412-14, 471-86.)

Courts defer to the ALJ's credibility findings "if the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so."  Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).  However, the ALJ did not discredit plaintiff's testimony of the intermittent and alternating nature of plaintiff's mental condition nor does the ALJ's decision reflect meaningful consideration of the condition.

Plaintiff's evidence may affect the ALJ's decision because determining the degree of mental limitations requires consideration of a claimant's ability to function on a sustained basis.  Further, it would render a finding of marked limitation not inconsistent with plaintiff's abilities to perform chores, shop, drive, and leave his home alone.  Reconsideration of the nature of plaintiff's mental condition evidence could also impact the ALJ determinations regarding social functioning, concentration, persistence, and pace, and episodes of decompensation.  Additionally, the record contains evidence to support findings that plaintiff satisfies the other sets of criteria necessary to qualify under either listing.

Accordingly, the undersigned remands the decision to the ALJ.  On remand the ALJ must consider and discuss plaintiff's evidence regarding the intermittent and alternating nature of plaintiff's mental condition and reconsider whether plaintiff qualifies under Listings 12.04 and 12.06.

## C. Credibility

Plaintiff argues that the ALJ erred by finding plaintiff's evidence regarding the severity of his mental condition not credible.  However, this argument is similar to his argument regarding Listings 12.04 and 12.06, rendering further discussion unnecessary.

Plaintiff also argues that the ALJ erred by finding plaintiff's evidence of headaches, edema, dizziness, and frequent urination not credible.  Although plaintiff failed to include the impairments in his applications for benefits, he raised them during the hearing.  (Tr. 52-53, 55-56.)

The ALJ based his credibility determination solely on the lack of support from the medical record.  (Tr. 20.)  Subsequent to the ALJ's decision, plaintiff submitted additional evidence supporting these allegations to the Appeals Council.  (Tr. 287-90, 491-501.) "When the Appeals Council has considered new and material evidence and declined review, we must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence." Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000).  The Appeals Council considered the later submitted evidence.  (Tr. 1-2, 5.)

The record corroborates plaintiff's evidence of dizziness and frequent urination caused by Furosemide.  The record indicates that plaintiff's medications included Furosemide and that Furosemide causes frequent urination and dizziness.  (Tr. 287-90, 514-19.)  Further, the record includes a diagnosis of angina and plaintiff's evidence that dizziness accompanied the onset of angina. (Tr. 497-99.)  Although the most recent records discussing edema indicate that edema was no longer present, they do not indicate discontinuation of the medication used to treat plaintiff's edema, Furosemide.  (Tr. 514-19.)  Finally, although plaintiff's testimony that nitroglycerin, which he uses to treat

- 21 -

angina, causes headaches is unsupported by the medical record, "the [Commissioner] cannot simply reject complaints of pain because they were not supported by objective medical evidence." Ford v. Astrue, 518 F.3d 979, 982 (8th Cir. 2008). "Instead, the [Commissioner] must fully consider all evidence relating to the subjective complaints." Id. Nothing in the record contradicts plaintiff's allegations of headaches.

Thus, at Step Five of the required analysis, the Commissioner failed to demonstrate that plaintiff could perform work existing in significant numbers in the national economy. Thus, the decision denying plaintiff's disability benefits is not supported by substantial evidence. Accordingly, the court reverses the decision of the Commissioner and remands this case to the ALJ for reconsideration.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded to the ALJ. On remand the ALJ must consider and discuss plaintiff's evidence of the intermittent and alternating nature of his mental condition and reconsider whether plaintiff qualifies under Listings 12.04 and 12.06. Further, the ALJ must reconsider plaintiff's evidence of headaches, edema, dizziness, and frequent urination, their effect on his RFC, and plaintiff's ability to perform work existing in significant numbers in the national economy. An appropriate Judgment Order is issued herewith.


_____/S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**


Signed on August 14, 2013.

- 22 -